BICKNELL et al. v. AUSTIN MIN. CO.

(Circuit Court, D. Nevada. July 2, 1894.)

No. 570.

MINING LEASE—EXECUTION BY SUPERINTENDENT—RATIFICATION.
    Where a mining lease executed in the name of a corporation by its superintendent was turned over to defendant as successor in the ownership of the mine, and defendant, with knowledge as to how the lease was executed, allowed the lessee to work the mine for several months, and received the lessor's share of the proceeds, defendant will be deemed to have ratified the lease, and will not be allowed to question its validity because not executed under seal.

Action in trespass by John Bicknell and others against the Austin Mining Company. Judgment for plaintiffs.

James F. Dennis and Trenmor Coffin, for plaintiffs.
J. L. Wines and O. A. Murdock, for defendant.

HAWLEY, District Judge (orally). This is an action of trespass for forcibly depriving plaintiffs of the use and occupation of certain tailings and sluice boxes, and preventing them from working and enjoying the same, to their damage in the alleged sum of $20,000. The cause was tried before the court without a jury. Plaintiffs' title to the bed of tailings, and right to use and work the same, is derived by virtue of a certain written lease, which is in the words and figures as follows:

"Austin, Nev., May 20, 1890. The Manhattan Mining & Red. Co. hereby leases to John Bicknell, Dan Bowen, and George Dale the tailings of the old quartz mill, up to the point where the tailings leave the mill, provided these can be worked as closely to the mill without in any way disturbing the foundations or buildings. The following are the terms and conditions: The Manhattan M. & Red. Co. are to retain thirty per cent. of the gross proceeds of this washing, and the lessees are to do all pumping and labor, and to defray all expenses that may be necessary for the prosecution of this work.

"The Man. M. & Red. Co.,
"By C. A. Pratt, Supt.
"John Bicknell.
"G. W. Dale.
"D. W. Bowen."

At the time this lease was executed, the Manhattan Mining & Reduction Company was a corporation engaged in the business of mining, milling, and reducing ores, and was the owner of certain mines, mill, and reduction works, and of the tailings mentioned in the lease. C. A. Pratt was the superintendent of the corporation. The defendant, the Austin Mining Company, is a corporation, and claims to be the successor in interest to the property formerly owned by the Manhattan Mining & Reduction Company. In the summer of 1890, after the execution of the lease, plaintiffs went into possession of the tailings, and took out about $12,000 in amalgam and quicksilver, which was divided between the parties, in the ratio expressed in the lease. In 1891, James Hutchinson succeeded C. A. Pratt as superintendent. In the meantime a flood came in the cañon or ravine where the tailings were deposited, which destroyed plaintiffs' pipes, that were laid for the purpose of getting a supply of water to work the tailings; and at Hutchinson's urgent request, he being in need of money, and by mutual agreement, plaintiffs stopped work, and some of them commenced working for him, cleaning up under the pan mill, where about 134 flasks of quicksilver and a bar of bullion were taken out. At Hutchinson's request, they again stopped working the tailings, and went into his employ, running the concentrators, at $4 per day, which was more than the usual wages at that time, being induced to make this change by the statement of Hutchinson to them that "it makes no difference to you, because your lease is good, and your ground is still left you, and I need the money for the company." Plaintiffs were working at the concentrator when Mr. Farnsworth, manager of defendant, succeeded Hutchinson in the possession of the prop-

·erty. Shortly after Farnsworth took possession, the plaintiffs re-·newed work upon the tailings, and continued working under their lease as long as they could, until late in the fall of 1891. The .amount taken out by them that year was about $3,800. In the spring of 1892 they bought about 600 feet of sluice boxes in the bed ·of the ravine, and commenced making a deep cut below the point where the tailings were deposited, so that they could hydraulic the tailings, instead of shoveling them, as they had previously done. Mr. Bicknell said:.

"During the years 1890 and 1891 we done our work by shoveling, and in lots ·of places we had to have a scaffold built up five or six feet high, and, our sluices being still above that, we had to shovel our dirt twice, and if we attempted to work anywhere near down to bed rock it was exceedingly disad-·vantageous."

Plaintiffs were engaged about five months in running the cut, and ·took out during the year 1892 about $1,000, nearly all of which they ·obtained in a few days after finishing the cut. Thereafter controversies arose as to the validity of the lease, and of plaintiffs' right ·to work the tailings, and in January, 1893, Farnsworth ordered plaintiffs to take up their sluices and quit work, which they de-·clined to do, and thereafter, under Farnsworth's directions, 600 ·feet of plaintiffs' sluice boxes were torn up and thrown upon the bank of the ravine, and plaintiffs were ousted from the possession ·of the tailings, and deprived, by the acts of defendant's servants, ·from working the same.

1. When the lease was offered in evidence, defendant objected thereto upon the ground that no authority was shown for its execu-·tion; that it was not under the seal of the corporation; that its ex-·ecution was not the act of the corporation, and does not bind it, or ·its successor in interest; that, in any event, it amounts to nothing ·more than a permission to plaintiffs to go upon the premises and work the tailings at the will of the corporation, and could be ter-·minated at any time. In support of these objections, defendant relies upon certain general principles, which are admitted to be true, ·to the effect that an agent of a corporation, appointed for the pur-·pose of superintending and carrying on its business, has no authority, by virtue of such agency, to sell or dispose of the property ·of the corporation (Vescelius v. Martin [Colo. Sup.] 18 Pac. 338; Des-·patch Line of Packets v. Bellamy Manuf'g Co., 12 N. H. 205; Smith v. Stephenson, 45 Iowa, 645); that the authority of such an agent can-·not be enlarged by the unauthorized representations of an agent ·(Law v. Stokes, 32 N. J. Law, 249; Bickford v. Menier, 107 N. Y. 490, 14 N. E. 438); and that a deed of the corporate property must ·be under seal, and authorized by the corporate power of the corpora-·tion (Gen. St. Nev. § 806; Gashwiler v. Willis, 33 Cal. 11; Saffield ·v. Reclamation Co., 94 Cal. 546, 29 Pac. 1105). But these authorities, and the principles announced therein, fall short of being con-·clusive as to the power of Mr. Pratt to execute the lease in question. Although no express or corporate power is shown, it clearly ap-·pears from the evidence that he exercised the power of giving leases ·to miners, similar to this lease, to work certain portions of the

mines owned by the corporation, for certain percentages or royalties of the ore taken out. This tribute system prevailed in the Austin mining district, and the right of the superintendent of the corporation to execute such contracts and agreements does not appear to have been ever questioned until some time after defendant took possession of the property. With full knowledge of all the facts, the corporation consented to and ratified the acts of the superintendent, and received from the plaintiffs the fruits of their labor to the extent mentioned in the lease. This lease, with others of a similar character, was turned over to the defendant, and Mr. Farnsworth, as its superintendent or managing agent, while denying the validity of the lease, received the corporation's proportion of the quicksilver and amalgam taken out by plaintiffs, and turned over to them their proportion, as nominated in the bond. It is also shown by the testimony that Mr. Farnsworth, acting for the defendant, had bought the right of certain miners holding a tribute lease to certain mining ground for a specified sum of money. Under all the facts, circumstances, conditions, and surroundings, my opinion is that the objections urged to the validity of the lease, or its admissibility in evidence, are untenable. It may be that the corporation would be bound by the act of its superintendent, upon the ground, often recognized by the courts, that the authority of the agent to execute such leases was necessary and essential to the execution and performance of the business of the corporation (Sacalaris v. Railroad Co., 18 Nev. 155, 1 Pac. 835, and authorities there cited), for it is, perhaps, within the common knowledge of courts in the mining communities of this state, especially at Austin, that the superintendent of a mining corporation is authorized to conduct its ordinary business transactions, which may include the execution of a lease to portions of its mining ground, to be worked under the tribute system which there prevails. But it is unnecessary to invoke that principle in this case, because it clearly appears that the Manhattan corporation held out to the miners with whom it dealt that its superintendent had the power and authority to execute leases of the kind and character of that given to the plaintiffs, and, therefore, plaintiffs had the right to believe that such authority had been given; and having, for such a period of time, continued work, in good faith relying upon such authority, it would work great injury and hardship to the plaintiffs, and upon this ground the authority of the superintendent to execute this lease should be sustained. Story, Ag. § 127; Jacobson v. Poindexter, 42 Ark. 97; Banks v. Everest, 35 Kan. 687, 12 Pac. 141; Walsh v. Insurance Co., 73 N. Y. 5; Insurance Co. v. McCain, 96 U. S. 86; Pursley v. Morrison, 7 Ind. 356. The court in Walsh v. Insurance Co., recognizing this principle, said:

"The authority of an agent is not only that conferred upon him by his commission, but, also, as to third persons, that which he is held out as possessing. The principal is often bound by the act of his agent in excess or abuse of his actual authority; but this is only true between the principal and third persons who, believing, and having a right to believe, that the agent was acting within, and not exceeding, his authority, would sustain loss if the act was not considered that of the principal."

Arriving at this conclusion, it is unnecessary to further discuss the question as to the ratification by the principal of the act of its agent in executing the lease, or to cite authorities upon that point.

2. Defendant contends that a verbal agreement was entered into between Farnsworth, the agent of defendant, and the plaintiffs, whereby plaintiffs agreed to work the tailings only at such places as Farnsworth might designate, and to surrender the lease at his will and pleasure. Upon this point there is a direct conflict of evidence. I find the weight and preponderance thereof to be that no such agreement was ever entered into between the parties.

3. The only remaining question necessary to be noticed is as to the amount of damages which plaintiffs are entitled to recover. The testimony upon this point is, in many respects, vague, indefinite, uncertain, and unsatisfactory. The real value of the tailings could not be definitely ascertained until worked out. The plaintiffs were working them for the quicksilver and amalgam contained therein. The ground was spotted. In some places the tailings would not pay the expense of working; other places were rich. All the ground had to be worked over, as the quicksilver was found principally on the bed rock and in the lowest places. The estimates made of the value of the tailings upon the part of the plaintiffs varied from $20,-000 to $60,000. Upon the part of defendant, it was to the effect that the tailings had no value for the quicksilver and amalgam only, and that the silver in the tailings could not be extracted without having an extensive plant to work the same. It would serve no useful purpose to give even a summary of the evidence. It is enough to say that, upon a careful consideration and review of all the testimony, it clearly appears to my mind that the tailings were of considerable value, and that plaintiffs, if they had been unmolested in the working thereof, would have realized a profit therefrom over and above the actual expenses incurred in working the same. The plaintiffs, and the other witnesses introduced in their behalf, had been acquainted with the premises for over 20 years. Their opportunities of determining the value of the tailings were superior to the knowledge of defendant. None of its witnesses had worked the tailings, and most of them had resided at Austin but a short time. It is improbable, to say the least, that plaintiffs, with the knowledge they had, would have incurred the expense in doing the dead work of running the cut if the tailings were of no value, as testified to by defendant's witnesses. They were allowed to do this part of the work without protest, and it was only after they had reached a point where the working of the tailings proved to be profitable that objection to their working was made. The amount of quicksilver and amalgam that plaintiffs had previously taken out in former years, when unmolested, under the disadvantage of shoveling the tailings, tends very strongly to show that they could have realized a greater profit by the improved method furnished by running the deep cut, and hydraulicking, instead of shoveling, the large body of tailings. These and other matters of minor importance, testified to by the witnesses, have convinced me that plaintiffs' interests in the tailings, under the lease, were of considerable value. There was

much testimony tending to show that plaintiffs had worked out several places where the tailings were of greatest value. Weighing all the testimony as to the value of the tailings, the difficulties and expense of procuring water and of working the tailings, the portions worked out, excluding all testimony as to the plaintiffs' being thrown out of employment by the wrongful act of defendant, and confining the measure of damages to the profits which plaintiffs might or would have realized if they had not been ousted from the possession, and prevented from working the same, I assess the damages at $3,750. Let judgment be entered in favor of plaintiffs for that amount, and for costs.